Anne B. Shaver (CA Bar No. 255928)
ashaver@lchb.com
Michelle A. Lamy (CA Bar No. 308174)
mlamy@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN LLP
275 Battery St. Fl. 29
San Francisco CA 94111
Phone: (415) 956-1000
Fax: (415) 956-1008

James P. Keenley (CA Bar No. 253106)
jkeenley@bkkllp.com
Emily A. Bolt (CA Bar No.  2531027)
ebolt@bkkllp.com
BOLT KEENLEY KIM LLP
2855 Telegraph Ave., Suite 517
Berkeley CA 94705
Phone: (510) 225-0696
Fax: (510) 225-1095

*Attorneys for Plaintiffs and the Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND / SAN FRANCISCO DIVISION

| | |
|---|---|
| KATHERINE BAKER, JOSE LUNA, EDGAR POPKE, and DENNY G. WRASKE, Jr., on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> SAVE MART SUPERMARKETS, <br><br> Defendant. | Case No.: 3:22-cv-4645 <br><br> **CLASS ACTION** <br><br> **COMPLAINT (ERISA)** |

INTRODUCTION

1.  This case seeks redress for breaches of fiduciary duty by Defendant Save Mart Supermarkets ("Save Mart" or "Defendant") with respect to the Save Mart Select Heath Reimbursement Arrangement (the "HRA benefit"), a benefit program within the Save Mart Select Retiree Health Benefit Plan (the "Plan"). Save Mart repeatedly represented to Named Plaintiffs Jose Luna, Katherine Baker, Edgar Popke, and Denny G. Wraske, Jr. ("Plaintiffs"), and all other similarly situated Class members, that the HRA benefit provided by the Plan would be provided to any eligible non-union retiree and their spouse *for the life of the retiree*. These representations, which Save Mart made repeatedly up until the company announced it was terminating the non-union retiree medical plan in April 2022, were false and misleading because they obscured that the Plan could in fact be eliminated at any time, and that Save Mart did in fact intend to (and did) eliminate the Plan as a cost-saving measure when that became advantageous to Save Mart, which occurred immediately upon Save Mart's acquisition by a private equity firm from the family that had owned the company since its founding 70 years ago.

2.  Save Mart's motive for misrepresenting the terms and value of the Plan was simple: to save money and suppress union activity. Save Mart repeatedly and successfully used the medical benefits provided by the Plan to persuade employees to refrain from joining the United Food and Commercial Workers (UFCW), a union that represented many grocery workers including at certain Save Mart stores during the relevant period, and to work in positions that were not covered by the UFCW's collective bargaining. Save Mart touted its non-union retiree medical benefits as superior or equal to the benefits workers could obtain through union employment. The union's collective bargaining agreement, which Save Mart is a party to, provided for, and continues to provide for, retiree medical benefits to union retirees. The union retiree medical benefits cannot be taken away by Save Mart; the money that pays for those benefits is held by a trust fund and can only be used for the purpose of providing benefits for retirees. Even the board of trustees that sponsors and administers the UFCW retiree medical plan lacks the authority to do what Save Mart has done to its non-union retirees, as the union benefits can only be eliminated through collective bargaining in which workers and retirees would have negotiating leverage. Thus, Save Mart's representations to its non-union

workers were false because Save Mart's retiree medical benefits for non-union employees were in fact far less secure and allowed Save Mart to eliminate it at any time, at Save Mart's sole discretion.  Put simply, Save Mart made false assurances about the Plan's benefit as a means of suppressing union enrollment among Save Mart employees.  When Save Mart functionally terminated the Plan for non-union employees in April 2022, Save Mart's non-union employees—including Plaintiffs and other Class members—no longer had any form of retiree medical benefits, while Save Mart's UFCW employees continue to enjoy those benefits.  Save Mart's misrepresentations harmed Plaintiffs and the Class by causing them to forego these and other benefits of union membership, and to continue working for Save Mart as long as it took to become eligible for benefits under the Plan, in order to secure retiree medical benefits for themselves and their spouses that have now been taken away.

3.      Save Mart compounded these misrepresentations in 2015, by attempting (successfully) to leverage the HRA benefit to save costs for the company.  Specifically, Save Mart told retirement-eligible employees that if they did not retire on or before December 31, 2017, then they would lose the HRA benefit for their spouses.  This representation caused Plaintiffs Baker, Luna, Popke and Wraske, as well as numerous other Subclass members, to retire earlier than they otherwise would have in order to retain the spousal benefit for life.  By doing so, Plaintiffs and the Subclass lost years of income that they would otherwise have earned, in addition to losing entirely the medical benefits that they worked so long to secure.

4.      Plaintiffs seek to represent a Class of long-time Save Mart employees.  Indeed, in order to be eligible to participate in the Plan, an employee had to meet the following service requirements: (a) age 55 with 30 years of service; (b) age 60 with 15 years of service; (c) age 65 with ten years of service; or (d) the "Golden 85," whereby years of service plus age equals or exceeds 85.  Thus, Plaintiffs and the Class dedicated their entire careers, or major portions thereof, to Save Mart in return for the promise of the Plan's benefits upon retirement, including the HRA benefit.  Save Mart induced Plaintiffs and the Class to remain employed at Save Mart these many years by misrepresenting that upon retirement, the Plan benefits, including the HRA benefit, would be theirs for the duration of their lives.

5.     Absent legal recourse, these long-time employees will be forced to pay for medical care entirely on their own for the rest of their lives at significant cost, a breach of the trust they placed in Save Mart over the course of their life-long dedication to the company's success.  Further, Plaintiffs and the Class lost all of the unused money that they had accumulated in their HRA benefit accounts as of June 2022.  Thus, in eliminating the HRA benefit program Save Mart not only broke faith with its most dedicated employees by eliminating the benefit going forward, it also realized ill-gotten savings of millions of dollars in existing liability to reimburse medical expenses based on the amounts that had already accrued in participant accounts.

## JURISDICTION

6.     Plaintiffs bring this action for declaratory, injunctive, and monetary relief pursuant to sections 502(a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132 (a)(3).  This Court has subject matter jurisdiction over Plaintiffs' claim pursuant to ERISA § 502(e) and (f), 29 U.S.C. § 1132(e) and (f), and 28 U.S.C. § 1331.

## VENUE

7.     Venue lies in the Northern District of California pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the breaches alleged occurred in this District, and the ERISA-governed plan at issue was administered in this District.  Venue is also proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claim occurred within this District.  Save Mart operates dozens of stores in this District.  Plaintiffs Wraske, Popke and Baker all lived and worked in this District while accumulating the service credits necessary to become eligible for benefits under the Plan.  Save Mart frequently transferred its employees into and within this District, including Plaintiffs Wraske and Popke.  Plaintiff Baker currently resides, and did reside for the entire course of her career, in this District and received Plan benefits in this District.

## PARTIES

8.     At all relevant times, Plaintiff Jose Luna was a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).  Mr. Luna worked for Save Mart from 1984 to 2017,

during which time he obtained the age and service requirements necessary to become eligible for benefits under the Plan, including participation in the HRA benefit program for himself and his spouse. Mr. Luna retired from Save Mart in 2017 specifically to lock in the HRA benefit for his spouse. He was 53 years old at the time, and had not planned on retiring until at least 2023.

9.     At all relevant times, Plaintiff Katherine Baker was a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7). Ms. Baker began working for Save Mart in 1989 when Save Mart purchased Fry's Food Stores, where Ms. Baker had been working since 1977. Ms. Baker continued working at Save Mart until 2017, during which time she obtained the age and service requirements necessary to become eligible for benefits under the Plan, including participation in the HRA benefit program for herself and her spouse. Ms. Baker retired from Save Mart in 2017 specifically to lock in the HRA benefit for her spouse. She was 57 years old at the time, and had not planned on retiring until at least 2023.

10.     At all relevant times, Plaintiff Edgar Popke was a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7). Mr. Popke worked for Save Mart from 1978 to 2017, during which time he obtained the age and service requirements necessary to become eligible for benefits under the Plan, including participation in the HRA benefit program for himself and his spouse. Mr. Popke retired from Save Mart in 2017 specifically to lock in the HRA benefit for his spouse. He was 56 years old at the time, and had not planned on retiring until at least 2023.

11.     At all relevant times, Plaintiff Denny G. Wraske, Jr. was a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7). Mr. Wraske worked for Save Mart from 1971 to 2017, during which time he obtained the age and service requirements necessary to become eligible for benefits under the Plan, including participation in the HRA benefit program for himself and his spouse. Mr. Wraske retired from Save Mart in 2017 specifically to lock in the HRA benefit for his spouse. He was 64 years old at the time, and had not planned on retiring until at least 2020.

12.     Defendant Save Mart is a grocery store operator headquartered in Modesto, California. At all relevant times, the Plan was an employee welfare benefit plan within the meaning of ERISA § 3(1), 29 U.S.C. § 1002(1). At all relevant times, Save Mart was the Plan administrator within the

meaning of ERISA § 3(16), 29 U.S.C. § 1002(16)(A)(i), the Plan sponsor within the meaning of

ERISA § 3(16), 29 U.S.C. § 1002(16)(B), and a fiduciary of the Plan within the meaning of ERISA §

3(21), 29 U.S.C. § 1002(21).

### FACTS

13.     Save Mart is the largest regional grocer in California, operating over 200 stores across

northern and central California and western Nevada. Save Mart employs tens of thousands of people

and generates billions of dollars in annual revenue.

14.     Save Mart employees are divided into two categories for welfare benefit purposes:

union and non-union.  Most of the union employees receive benefits through the UFCW & Employers

Trust pursuant to collective bargaining agreements.  Non-union employees receive benefits pursuant to

the terms of benefit plans adopted by Save Mart, governed by the terms of the benefit plans Save Mart

has chosen to establish.

15.     The Save Mart Select Retiree Health Benefit Plan, referred to herein as the Plan, is one

of the benefit plans adopted by Save Mart for its non-union employees.  It provides health care

benefits to eligible retirees and their dependents.

16.     The Save Mart Select Heath Reimbursement Arrangement, referred to herein as the

HRA benefit, was a component of the Plan.  The HRA benefit was a monthly $500 contribution to a

health reimbursement account for each eligible retiree and an additional $500 for their spouse. The

retiree and spouse could use the money accrued in their HRA account to pay for qualified medical

expenses, including paying premiums for individual health insurance coverage that retirees purchased

for themselves and their spouses in lieu of receiving group medical coverage directly from the Plan.

Under the terms of the Plan, the monthly contributions for each retiree and spouse accumulated until

they were used for qualified medical expenses.  The terms of the Plan and the Plan's Summary Plan

Description stated that participation in the Plan would continue until the death of the retiree.

Informational materials distributed to employees likewise stated that benefits would end upon the

death of the retiree

17.     The HRA benefit was implemented by Save Mart effective April 1, 2016.  Prior to then,

the retiree medical benefit consisted of providing group medical benefits to retirees and their dependents and contributing toward the premiums for that coverage.  At all relevant times, the Plan provided for a substantial medical benefit for retirees and their spouses, whether in the form of an HRA plan or payment of insurance premiums.  As of April 1, 2016, the only retiree medical benefit available to non-union employees was the HRA benefit.

18.     Save Mart used the benefits provided by the Plan as a tool to persuade employees not to join the union.  Save Mart made repeated statements to Plaintiffs, to existing employees, to potential recruits, and to the employees of stores like Frye's that Save Mart acquired over the years, that one of the benefits of non-union employment was that non-union employees would enjoy retiree medical benefits for life that were equal to or greater than the benefits enjoyed by union employees.

19.     Save Mart union employees also enjoy retiree medical benefits based on similar eligibility criteria to the Plan.  Those benefits are guaranteed to them unless and until the union relinquishes them as part of a collective bargaining process.  With the elimination of the HRA benefit program in June 2022, Plaintiffs and similarly situated Save Mart non-union retirees no longer have access to any retiree medical benefits, unlike their union counterparts.

20.     Save Mart made repeated statements to Plaintiffs, and to similarly situated employees, that as soon as they met the Plan's eligibility criteria, the retiree medical benefit would be available to them upon retirement for the duration of their life.  These representations continued up through the HRA benefit termination in 2022.

21.     The statements described above were made in multiple ways:  in direct communications with Save Mart human resources (HR) employees who were specifically tasked by Save Mart to convey information about the benefits offered by the company; in quarterly meetings with employees designated by Save Mart to communicate information about the benefits offered by Save Mart; in large group manager meetings conducted by executives and HR staff; and in direct communications by executives of Save Mart with employees, including the HR staff tasked with conveying information about the Plan to other employees, to persuade employees of the benefits of non-union employment.

22.     Save Mart also distributed written materials to Plaintiffs and similarly situated

employees for the express purpose of providing information about retiree medical benefits. These written materials unambiguously stated that the medical benefit would continue until the death of the retiree, while omitting the fact that the governing Plan documents stated that Save Mart retained the discretion to terminate the Plan and any of its component benefits at any time, including retroactively.

23.     Save Mart also presented information about the Plan benefits in PowerPoint presentations that omitted the fact that Save Mart retained the discretion to terminate the Plan and any of its component benefits at any time, including retroactively.

24.     Plaintiffs and their beneficiaries, and hundreds or thousands of similarly situated employees, made employment decisions and planned the financial details of their retirements, including vitally important decisions like how long they would work before retirement, based on Save Mart's misrepresentations about the duration of the retiree medical benefits, which they reasonably believed would last for the rest of their lives based on Save Mart's direct misrepresentations that they would.

25.     At the time of the 2016 Plan amendment implementing the HRA benefit program for non-union employees, Save Mart told retirement-eligible employees that if they retired before December 31, 2017, they would be able to retain the HRA benefit for their spouses, but that the spousal benefit would not be available to employees who retired after this date. The purpose of this feature of the amendment was to persuade eligible employees to retiree because Save Mart had concluded that their retirements were in the best economic interests of the company, and in so doing Save Mart acted against the best interests of their employees and potential Plan participants.

26.     In connection with this announcement, Plaintiffs and other similarly situated employees spoke with HR employees who were specifically tasked by Save Mart to communicate information about retiree medical benefits. These employees were told that by retiring by December 31, 2017, they would retain the HRA benefit for them and their spouses for life.

27.     Plaintiffs and numerous other similarly situated employees retired early, on the basis of Save Mart's misrepresentation that they would retain the HRA benefit for life for them and their spouses if they retired by December 31, 2017.

28.     Save Mart's representations that the HRA benefit would continue for life were false and misleading.  The terms of the Plan allowed Save Mart to terminate the program at any time, including for employees who retired before December 31, 2017.

29.     In March 2022 a private equity firm called Kingswood Capital Management LP acquired Save Mart from the family that had owned it from its founding 70 years prior.  Not coincidentally, on April 2022, Save Mart announced that it was eliminating the HRA benefit entirely as of June 2022, which functionally eliminated all retiree medical benefits for non-union retirees.  Plan participants were told that they had until June 2022 to incur covered medical expenses that would be paid for by the funds accumulated in their HRA accounts.  After June 2022, no further medical expenses would be covered, and all funds accumulated in the HRA accounts would revert to Save Mart.

30.     As a direct and proximate result of Save Mart's misrepresentations regarding the duration of the HRA benefit, Plaintiffs and a similarly situated class of retirees and their beneficiaries were harmed in the form of lost retiree health benefits.   As a direct and proximate result of Save Mart's misrepresentations regarding the duration of the HRA benefit, Plaintiffs and a similarly situated Subclass of retirees and their beneficiaries were also harmed in the form of lost opportunity to work and earn additional income because of having retired prematurely on the basis of Save Mart's misrepresentations.

## RULE 23 ALLEGATIONS

31.     Plaintiffs bring this action as a proposed class action on behalf of themselves and a Class and Subclass of those similarly situated.

32.     The proposed Class is all retired non-union employees who were participants in the Save Mart Select Retiree Health Benefit Plan (the "Class") as of the amendment terminating benefits in April 2022.

33.     The proposed Subclass is all retired non-union employees who were participants in the Save Mart Select Retiree Health Benefit Plan, who received a communication from Save Mart in 2016

informing them of their eligibility to retire and of the fact that if they did not retire by December 31, 2017, they would lose the spousal health benefit, and who did in fact retire by December 31, 2017.

34.   The proposed Class is numerous, consisting of thousands of people, such that joinder is impractical.

35.   The proposed Subclass is numerous, consisting of hundreds of people, such that joinder is impractical.

36.   There are questions of law and fact common to the Class and Subclass, including but not limited to:

    a.   Whether Save Mart misrepresented the nature of the medical benefit to Class Members?

    b.   Whether such misrepresentations constituted breaches of fiduciary duty under ERISA § 401(a)(1)(A)-(B)?

    c.   Whether Plaintiffs and the Class are entitled to equitable relief to reform the terms of the Plan to make those terms consistent with the representations Save Mart made about the duration of Plan benefits?

    d.   Whether Plaintiff and the Class are entitled to an equitable surcharge or other monetary relief to make them whole for Save Mart's breaches of fiduciary duty?

37.   These common questions of law and fact predominate over any relevant individual issues.

38.   Plaintiffs are members of the Class and Subclass, and have claims typical of the Class and Subclass.

39.   Plaintiffs are adequate class representatives, and have secured counsel experienced in the prosecution of claims under ERISA § 502(a)(3) and class actions.

## ALLEGATIONS OF NAMED PLAINTIFFS

### Plaintiff Katherine Baker

40.     Plaintiff Baker began her career in 1977, at the age of eighteen, as a Bagger at a Fry's store in Fremont, California.  She worked in various positions until she was promoted to Store Manager in 1988.  At all times at Fry's, her position was union.

41.     Save Mart purchased Fry's in 1989, and Ms. Baker became a Save Mart employee.  Her years of service and her union status were preserved with the acquisition.  However, in approximately 1991 Ms. Baker's boss, Dennis Nutson, told her that if she wanted to remain a Store Manager with Save Mart, she would have to give up her union status.  Because of the medical needs of her family, Ms. Baker was especially concerned about preserving her medical benefits.  Mr. Nutson assured her that as a non-union manager, her benefits would always be as good as or better than the union's benefits.  On the basis of this representation, Ms. Baker decided to remain in management and give up her union status.

42.     Ms. Baker worked in Fremont, California until approximately 1993, when she moved to manage a store in San José, California.  In approximately 1994, she was promoted to General Merchandise Supervisor for the Bay Area.  In approximately 2001, she was promoted to Grocery Supervisor for the Bay Area.  In approximately 2006, Ms. Baker was promoted to Senior Director of Operations, based out of Dublin, California but with responsibility for the greater Bay Area.  She remained in this position until her retirement in October, 2017.

43.     Over the years, Ms. Baker observed Save Mart's efforts to defeat the union from representing additional stores.  One common theme that she heard repeatedly from Save Mart representatives was that there was no need to join the union, because non-union employees' benefits would always be as good as or better than the union's.

44.     In approximately 2017, Ms. Baker received a letter from Save Mart advising her of her eligibility for retirement, and notifying her that if she retired by December 31, 2017, both she and her spouse would receive the HRA benefit, but if she did not, her spouse would lose his benefit.  She was fifty-seven years old with forty years of service.

45.     Ms. Baker had planned to work until the age of at least sixty-five, and those years of income figured prominently in her family's retirement planning.  However, she did not want to lose the HRA benefit for her spouse, knowing that medical care is especially important and costly as one ages.

46.     In reliance on Save Mart's written and verbal representations that the HRA benefit for her and her spouse would continue for the duration of her life, Ms. Baker decided to retire early to keep the spousal benefit, and retired effective October 2017 at the age of fifty-seven.

47.     Save Mart's termination of the HRA benefit will cost Ms. Baker thousands of dollars over the duration of her life.  In addition, Ms. Baker lost at least seven years of income that she would have earned, absent early retirement, as a direct result of Save Mart's misrepresentations about the HRA benefit.

**Plaintiff Jose Luna**

48.     Plaintiff Luna began his lifelong career with Save Mart in 1984, at age twenty-one, as a Cashier in Tracy, California.  The store that he joined was one of the few non-unionized Save Mart stores, and the company was working hard to keep it that way.  When Mr. Luna joined, the recruiters told him that as a non-union employee his benefits would be as good as or better than the union's benefits.

49.     Within two years, Mr. Luna worked his way up to a Head Clerk position.  In 1989, he was promoted to Assistant Store Manager and moved to a store in Turlock, California.  The store was unionized but management positions were not included in the union.  At the time of his promotion, Save Mart again reassured Mr. Luna that his benefits as a non-union employee would be as good as or better than the union's benefits.

50.     Mr. Luna became a Store Manager in 1993 in Modesto, California.  From that time until his retirement in December 2017, Mr. Luna worked as a Store Manager of unionized Save Mart stores, though he was ineligible to join the union due to his management position.  Throughout that period of time, Mr. Luna heard many times that benefits for non-union management positions would be as good as or better than the union's.

51.     In 2015, through his combination of age (then fifty-three) and years of service (thirty-two), Mr. Luna met the "Golden 85" rule making him eligible for retirement.  He received a letter from Save Mart advising him of his eligibility, and notifying him that if he retired by December 31, 2017, both he and his spouse would receive the HRA benefit, but if he did not, his spouse would lose her benefit.

52.     Mr. Luna was extremely torn by this decision.  On the one hand, he had planned to work until the age of at least sixty-two, and those years of income figured prominently in his family's retirement planning.  Also, management had just offered him a new position in a store that was projected to bring large bonuses.  On the other hand, he did not want to lose the HRA benefit for his spouse, knowing that medical care is especially important and costly as one ages.  In 2017, he spoke with a representative in Save Mart's HR department to ask questions about his retirement benefits to help him make this critical decision.  The HR department told him that as long as he retired by December 31, 2017, both he and his spouse would keep their HRA benefit for the duration of Mr. Luna's life.

53.     In reliance on Save Mart's written and verbal representations that the HRA benefit would be for the duration of his life, Mr. Luna decided to retire early to keep the spousal benefit, and retired effective December 31, 2017 at the age of fifty-six.

54.     Save Mart's termination of the HRA benefit will cost Mr. Luna thousands of dollars over the duration of his life.  In addition, Mr. Luna lost at least six years of income that he would have earned, absent early retirement, as a direct result of Save Mart's misrepresentations about the HRA benefit.

**Plaintiff Edgar Popke**

55.     Plaintiff Popke was raised on Save Mart food and in the Save Mart family.  His mother worked most of her career for Save Mart.  Mr. Popke joined Save Mart in 1978, at age eighteen, as a Produce Clerk in Modesto, California.  The position was union and Mr. Popke received union benefits.

56.     Mr. Popke was soon promoted to Produce Manager, and then recruited to become a Store Manager, which was a non-union position.  Mr. Popke deferred the promotion for several years

because of the additional hours of work it would require and the young age of his children.  In 2003, he decided to accept a promotion, and at that time he spoke with his managers Steve Beaver and Bob Bauer about the impact that the promotion would have on his benefits package. They assured Mr. Popke that his benefits would always be as good as or better than the union's.

57.    Mr. Popke was promoted several times in the following years.  He moved from Produce Supervisor for the Central Division, to Special assistant to Executive Vice President Junquiero, to Senior Director for the Bay Area District, to Senior Director of the Modesto Region, and finally to Vice President of Operations in 2011.  He remained in that role until his retirement in 2017.

58.    During his tenure as Senior Director for the Bay Area, one of Mr. Popke's primary responsibilities was to oversee the integration of stores that Save Mart acquired through purchase (such as former Albertson's stores) into the Save Mart model.  Save Mart worked hard to prevent these stores from joining the union.  Mr. Popke was advised by Wendy Kennedy, then Senior Director of Human Resources, to tell newly-acquired store employees that their benefits would always be as good as or better than the union's.  He visited many Bay Area stores alongside representatives from Save Mart's HR department to speak to the employees and their families about compensation and benefits. He consistently heard the refrain that non-union employees' benefits would always be equal to or better than the union's.

59.    In approximately 2017, Mr. Popke received a letter from Save Mart advising him of his eligibility for retirement, and notifying him that if he retired by December 31, 2017, both he and his spouse would receive the HRA benefit, but if he did not, his spouse would lose her benefit. At that time he was fifty-six years old with and thirty-eight years of service.

60.    Mr. Popke had planned to work until the age of at least sixty-two, and those years of income figured prominently in his family's retirement planning.  He was well paid for his work and enjoyed it.  However, he did not want to lose the HRA benefit for his spouse, knowing that medical care is especially important and costly as one ages.

61.    In reliance on Save Mart's written and verbal representations that the HRA benefit would be for the duration of his life, Mr. Popke decided to retire in time to keep the spousal benefit,

and retired effective January 3, 2017 at the age of fifty-six.

62.    Save Mart's termination of the HRA benefit will cost Mr. Popke thousands of dollars over the duration of his life.  In addition, Mr. Popke lost at least six years of income that he would have earned, absent early retirement, as a direct result of Save Mart's misrepresentations about the HRA benefit.

**Plaintiff Denny G. Wraske, Jr.**

63.    Plaintiff Wraske joined Save Mart in 1971, at the age of seventeen, as a grocery clerk in Modesto, California.  The position was union and Mr. Wraske received union benefits.  He worked in various union positions until he was promoted to Assistant Store Manager in approximately 1985.

64.    Mr. Wraske was promoted several times in the following years.  He moved from Assistant Store Manager to Store Manager, to Grocery Superior of Modesto and the Bay Area, to Senior Director in Modesto and in Fresno, and finally to Senior Director of Operations for Northern California in approximately 2010.  He remained in that role until his retirement in 2017.

65.    Over the years, Mr. Wraske observed Save Mart's efforts to defeat the union from representing additional stores.  One common theme he heard repeatedly from Save Mart representatives was that there was no need to join the union, because non-union employees' benefits would always be as good as or better than the union's benefits.

66.    In approximately 2017, Mr. Wraske received a letter from Save Mart advising him of his eligibility, and notifying him that if he retired by December 31, 2017, both he and his spouse would receive the HRA benefit, but if he did not, his spouse would lose her benefit.  He was sixty-three years old and had worked for Save Mart for forty-six years.

67.    At that time, Mr. Wraske and his wife's retirement plan was that Mr. Wraske would work for another three years.  However, he did not want to lose the HRA benefit for his spouse, knowing that medical care is especially important and costly as one ages, and because his wife also wanted to retire, which would eliminate her medical benefits.

68.    In reliance on Save Mart's written and verbal representations that the HRA benefit would be for the duration of his life, Mr. Wraske decided to retire in time to keep the spousal benefit,

and retired effective December 28, 2017 at the age of sixty-four.

69.   Save Mart's termination of the HRA benefit will cost Mr. Wraske thousands of dollars over the duration of his life.  It also meant that his wife has had to postpone her retirement in order to maintain her medical benefits.  In addition, Mr. Wraske lost three years of income that he would have earned, absent early retirement, as a direct result of Save Mart's misrepresentations about the HRA benefit.

### FIRST CLAIM FOR RELIEF
### (Breach of Fiduciary Duty Under ERISA § 401(a)(1) (A) and (B) against Defendant Save Mart)

70.   Plaintiffs incorporate the preceding paragraphs as though set forth herein.

71.   ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires that a fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries, (A) for the exclusive purpose of providing benefits to participants and the beneficiaries of the Plan, and (B) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

72.   A fiduciary's duties of loyalty and prudence include a duty to disclose and inform. These duties not only require that a fiduciary comply with the disclosure provisions in Title I of ERISA, but also require: (a) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

73.   Save Mart breached these duties as to Plaintiffs and the Class by misrepresenting information about the duration of the HRA benefit that Plaintiffs and other employees relied on to their detriment, these breaches occurred and continued up through the date that Save Mart announced it was terminating the HRA benefit.

74.   ERISA § 502(a)(3), 29 U.S.C. § 1102(a)(3), authorizes a plan participant to bring a civil action to obtain appropriate equitable relief to redress violations of ERISA, including Save Mart's breaches of its fiduciary duties under ERISA § 401(a)(1), 29 U.S.C. § 1104(a)(1).

75.     Under ERISA § 502(a)(3), 29 U.S.C. § 1102(a)(3), Plaintiffs and the Class are entitled to have the Plan reformed to reflect their understanding about the duration of the HRA benefit and/or to have Save Mart pay an equitable surcharge to compensate Plaintiffs and the Class for the loss of the HRA benefit and the retirement decisions they made based on Defendant's misrepresentations.  For Subclass members, this includes lost earnings due to their falsely induced early retirement.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court grant the following relief:

A.     Declare that Save Mart has breached its fiduciary duties to Plaintiffs and the Class and Subclass and/or knowingly participated in breaches of fiduciary duty;

B.     Order that Save Mart provide appropriate equitable relief to Plaintiffs and the Class and Subclass, including but not limited to surcharge, reformation of the Plan, and/or an injunction requiring Save Mart to administer the Plan with respect to Plaintiffs and the Class and Subclass in a manner consistent with the terms of the Plan in existence prior to the elimination of the HRA benefit in 2022;

C.     Award Plaintiffs and the Class attorneys' fees and costs of suit incurred herein pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g); and

D.     Provide such other relief as the Court deems equitable and just.

Respectfully submitted,

Dated:  August 11, 2022                     BOLT KEENLEY KIM LLP

By: /s/ *James P. Keenley*

James P. Keenley (CA Bar No. 253106)
Emily A. Bolt (CA Bar No.  2531027)
BOLT KEENLEY KIM LLP
2855 Telegraph Ave., Suite 517
Berkeley CA 94705
Phone: (510) 225-0696
Fax: (510) 225-1095
jkeenley@bkkllp.com
ebolt@bkkllp.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Anne B. Shaver (CA Bar No. 255928)
Michelle A. Lamy (CA Bar No. 308174)
LIEFF CABRASER HEIMANN & BERNSTEIN LLP
275 Battery St., Fl. 29
San Francisco CA 94111
Phone: (415) 956-1000
Fax: (415) 956-1008
ashaver@lchb.com
mlamy@lchb.com

*Attorneys for Plaintiffs and the Class*