Anne B. Shaver (CA Bar No. 255928)
Michelle A. Lamy (CA Bar No. 308174)
Benjamin A. Trouvais (CA Bar No. 353034)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery St., 29th Floor
San Francisco, CA 94111-3339
Phone:  (415) 956-1000
Fax:  (415) 956-1008

James P. Keenley (CA Bar No. 253106)
Emily A. Bolt (CA Bar No. 253109)
BOLT KEENLEY KIM LLP
2855 Telegraph Ave., Suite 517
Berkeley, CA 94705
Phone: (510) 225-0696
Fax: (510) 225-1095

Matthew J. Matern (CA Bar No. 159798)
Mikael H. Stahle (CA Bar No. 182599)
MATERN LAW GROUP, PC
1230 Rosecrans Ave., Suite 200
Manhattan Beach, CA 90266
Phone: (310) 531-1900
Fax: (310) 531-1901

*Attorneys for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| KATHERINE BAKER, JOSÉ LUNA, EDGAR POPKE, and DENNY G. WRASKE, Jr. on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAVE MART SUPERMARKETS and SAVE MART SELECT RETIREE HEALTH BENEFIT PLAN,<br><br>Defendants. | Case No. 3:22-CV-4645-AMO<br><br>**CLASS ACTION**<br><br>**SECOND AMENDED COMPLAINT (ERISA)** |

**INTRODUCTION**

1.      This case seeks redress for breaches of fiduciary duty by Defendant Save Mart Supermarkets ("Save Mart" or "Defendant") with respect to the Save Mart Select Retiree Health Benefit Plan (the "Plan") and for Save Mart's failure to comply with the Plan terms for terminating a benefit program under the Plan.  Save Mart repeatedly represented to Named Plaintiffs Katherine Baker, Jose Luna, Edgar Popke, and Denny G. Wraske, Jr. ("Plaintiffs"), and all other similarly situated Class members, that the company would provide non-union retirees with medical benefits as good or better than their union counterparts, and that the retiree medical benefits would be provided to any eligible non-union retiree and their spouse *for the life of the retiree*.  Save Mart made these representations consistently up until the company announced in April 2022 that it was ending the non-union retiree medical benefit effective June 30, 2022.  These representations were false and misleading because they obscured that the Plan could in fact be eliminated at any time, and that Save Mart did in fact intend to (and did) eliminate the Plan as a cost-saving measure when that became advantageous to Save Mart, which occurred immediately upon Save Mart's acquisition by a private equity firm from the family that had owned the company since its founding 70 years ago.

2.      Save Mart's motive for misrepresenting the terms and value of the Plan was simple: to save money, suppress union activity, and induce Plaintiffs and the Class to work for Save Mart long enough to qualify for retiree medical benefits.  Save Mart repeatedly and successfully used the medical benefits provided by the Plan to persuade employees not to join the United Food and Commercial Workers (UFCW)—a union that represented many grocery workers including at certain Save Mart stores during the relevant period—and to instead work in positions that were not covered by the UFCW's collective bargaining.  Specifically, Save Mart touted the company's non-union retiree medical benefits as superior or equal to the benefits workers could obtain through union employment.  As explained in detail below, this representation was made numerous times over a period of many years by Save Mart's Human Resources (HR) and executive level employees in group and individual meetings with workers.  According to former Vice President of HR Wendy Kennedy, "[t]hese statements were made so regularly by

1    management, supervisors, and Human Resources personnel that it was commonly understood and

2    repeated by and amongst Save Mart employees." Decl. of Wendy Kennedy ("Kennedy Decl."),

3    submitted herewith, ¶ 12. This message was also expressly set forth in written materials that were

4    disseminated to employees to persuade those employees to vote no to unionization in their stores;

5    for example a pamphlet entitled "Save Mart Answers Your Questions About Unions" was given

6    to Plaintiff Jose Luna, and it states: "your benefits are already better, or equal to, the benefits in a

7    union store." Exhibit A, submitted herewith. Save Mart also distributed a pamphlet entitled

8    "Save Mart Select Retiree Benefits" to each employee on an annual basis, which states that retiree

9    medical coverage ends "upon the death of the retiree." Exhibit B, submitted herewith.

10        3.      These representations were false. In reality, the UFCW's collective bargaining

11   agreement—which Save Mart is a party to—provided for, and continues to provide for, retiree

12   medical benefits to union retirees that were and are more secure than those offered by the Plan.

13   Unlike benefits provided by the Plan, the terms of the union's retiree medical benefit program do

14   not permit Save Mart to eliminate the benefits at its own discretion. Unlike the benefits provided

15   by the Plan, the money that funds the union benefits is held by a trust and can only be used for

16   purposes of providing benefits, and it cannot be taken back by Save Mart. Unlike the Plan, the

17   union retiree medical benefits are sponsored by a joint labor-management board of trustees that

18   ensures employee representatives have equal representation and negotiation leverage in the

19   decisions that are made around how benefits will be provided. Crucially, unlike the Plan, the only

20   process that could result in elimination of the union benefits is collective bargaining. By contrast,

21   the Plan's non-union benefits could be eliminated on the company's whim and were eliminated as

22   soon as the company was acquired by new owners, who were eager to turn a quick profit on their

23   investment.

24        4.      Thus, Save Mart's representations to its workers that it would provide benefits as

25   good or better than the union's benefits were false. Save Mart's retiree medical benefits for non-

26   union employees were in fact far less secure and allowed Save Mart to eliminate the benefits at

27   any time, at Save Mart's sole discretion. Put simply, Save Mart made false assurances about the

28   Plan's benefits as a means of suppressing union enrollment among Save Mart employees. When

1    Save Mart functionally ended retiree medical benefits for non-union employees in June 2022,

2    Save Mart's non-union employees—including Plaintiffs and other Class members—no longer had

3    any form of retiree medical benefits, while Save Mart's UFCW employees continue to enjoy

4    those benefits.  Save Mart's misrepresentations therefore harmed Plaintiffs and the Class by

5    inducing them to continue working for Save Mart as long as it took to become eligible for

6    benefits under the Plan instead of other employment opportunities in order to secure retiree

7    medical benefits for themselves and their spouses that have now been taken away, preventing

8    them from adequately planning for and saving for their retirements because they relied on the

9    availability of this valuable benefit.

10        5.    Save Mart compounded these misrepresentations when it amended the Plan for

11   2016, by leveraging the non-union medical benefits to save costs for the company.  Specifically,

12   Save Mart told retirement-eligible employees that if they did not retire on or before December 31,

13   2017, then they would lose the Plan's medical benefits for their spouses.  This representation

14   caused Plaintiffs, as well as numerous other Class members, to retire earlier than they otherwise

15   would have in order to retain the spousal benefit for life.

16        6.    Plaintiffs and the Class are dedicated, loyal, and long-time Save Mart employees.

17   Plaintiff Baker worked for Save Mart for 28 years; Plaintiff Luna for 33 years; Plaintiff Popke for

18   39 years; and Plaintiff Wraske for 46 years.  Indeed, in order to be eligible to participate in the

19   Plan, an employee had to meet one of the following service requirements: (a) age 55 with 30

20   years of service; (b) age 60 with 15 years of service; (c) age 65 with ten years of service; or (d)

21   the "Golden 85," whereby years of service plus age equals or exceeds 85.  Thus, Plaintiffs and the

22   Class dedicated their entire careers, or major portions thereof, to Save Mart in return for the

23   promise of the Plan's benefits upon retirement, including the medical benefits.  Save Mart

24   induced Plaintiffs and the Class to remain employed at Save Mart these many years by

25   misrepresenting that upon retirement, the medical benefits would be theirs for the duration of

26   their lives.

27        7.    Subsequent to the filing of Plaintiffs' initial and first amended complaints,

28   Plaintiffs have learned, through the discovery process, that Save Mart did not terminate the HRA

1   benefit program in compliance with the governing Plan terms for terminating a benefit program.

2   As alleged in detail herein, *infra*, this gives rise to additional claims by Plaintiffs and the

3   proposed Class that are asserted for the first time in this Second Amended Complaint.

4          8.     Absent legal recourse, these long-time employees will be forced to pay for medical

5   care and health insurance entirely on their own for the rest of their lives at significant cost—a cost

6   they had not prepared for, given Save Mart's repeated representations that their decades of loyalty

7   to the company had resulted in a lifetime medical benefit.  To deny them legal recourse would be

8   to reward Save Mart's breach of the trust Plaintiffs and the Class placed in Save Mart over the

9   course of their life-long dedication to the company's success.  Further, Plaintiffs and the Class

10   lost all of the unused money that they had accumulated in their Health Reimbursement

11   Arrangement ("HRA") benefit accounts as of June 2022, which for many Class members was in

12   the tens-of-thousands of dollars.  Thus, in eliminating the HRA benefit program, Save Mart not

13   only broke faith with its most dedicated employees by eliminating their medical benefits going

14   forward, it also realized ill-gotten savings of millions of dollars in existing liability that Plaintiffs

15   and Class members had intended to use towards health insurance premiums and to reimburse

16   medical expenses, based on the amounts that had already accrued in their accounts.  Through this

17   action, Plaintiffs and the Class seek to prevent these unlawful and unjust results.

18   **JURISDICTION**

19          9.     Plaintiffs bring this action for declaratory, injunctive, and monetary relief pursuant

20   to sections 502(a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29

21   U.S.C. § 1132 (a)(3).  This Court has subject matter jurisdiction over Plaintiffs' claim pursuant to

22   ERISA § 502(e) and (f), 29 U.S.C. § 1132(e) and (f), and 28 U.S.C. § 1331.

23   **VENUE**

24         10.    Venue lies in the Northern District of California pursuant to ERISA § 502(e)(2),

25   29 U.S.C. § 1132(e)(2), because the breaches alleged occurred in this District, and the ERISA-

26   governed plan at issue was administered in this District.

27         11.    Venue is also proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of

28   the events or omissions giving rise to Plaintiffs' claim occurred within this District.  Save Mart

operates dozens of stores in this District.  Plaintiff Baker currently resides, and did reside for the entire course of her career, in this District and received Plan benefits in this District.  Plaintiffs Wraske, Popke and Baker all lived and worked in this District while accumulating the service credits necessary to become eligible for benefits under the Plan.  Save Mart frequently transferred its employees into and within this District, including Plaintiffs Wraske and Popke.

**PARTIES**

12.     At all relevant times, Plaintiff Katherine Baker was a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).  Ms. Baker began working for Save Mart in 1989 when Save Mart purchased Fry's Food Stores, where Ms. Baker had been working since 1977.  Ms. Baker continued working at Save Mart until 2017, during which time she obtained the age and service requirements necessary to become eligible for benefits under the Plan, including participation in the HRA benefit program for herself and her spouse.  Ms. Baker retired from Save Mart in 2017 specifically to lock in the HRA benefit for her spouse.  She was 57 years old at the time, and had not planned on retiring until at least 2023.

13.     At all relevant times, Plaintiff Jose Luna was a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).  Mr. Luna worked for Save Mart from 1984 to 2017, during which time he obtained the age and service requirements necessary to become eligible for benefits under the Plan, including participation in the HRA benefit program for himself and his spouse.  Mr. Luna retired from Save Mart in 2017 specifically to lock in the HRA benefit for his spouse.  He was 53 years old at the time, and had not planned on retiring until at least 2023.

14.     At all relevant times, Plaintiff Edgar Popke was a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).  Mr. Popke worked for Save Mart from 1978 to 2017, during which time he obtained the age and service requirements necessary to become eligible for benefits under the Plan, including participation in the HRA benefit program for himself and his spouse.  Mr. Popke retired from Save Mart in 2017 specifically to lock in the HRA benefit for his spouse.  He was 56 years old at the time, and had not planned on retiring until at least 2023.

15. At all relevant times, Plaintiff Denny G. Wraske, Jr. was a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7). Mr. Wraske worked for Save Mart from 1971 to 2017, during which time he obtained the age and service requirements necessary to become eligible for benefits under the Plan, including participation in the HRA benefit program for himself and his spouse. Mr. Wraske retired from Save Mart in 2017 specifically to lock in the HRA benefit for his spouse. He was 64 years old at the time, and had not planned on retiring until at least 2020.

16. Defendant Save Mart is a grocery store operator headquartered in Modesto, California. At all relevant times, the Plan was an employee welfare benefit plan within the meaning of ERISA § 3(1), 29 U.S.C. § 1002(1). At all relevant times, Save Mart was the Plan administrator within the meaning of ERISA § 3(16), 29 U.S.C. § 1002(16)(A)(i), the Plan sponsor within the meaning of ERISA § 3(16), 29 U.S.C. § 1002(16)(B), and a fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21).

17. Defendant Save Mart Select Retiree Health Plan is an employee welfare benefit plan within the meaning of ERISA § 3(1), 29 U.S.C. § 1002(1). At all relevant times the Plan required Save Mart to make HRA contributions to Plaintiffs and the Class.

**FACTS**

18. Save Mart is the largest regional grocer in California, operating over 200 stores across northern and central California and western Nevada. Save Mart employs tens of thousands of people and generates billions of dollars in annual revenue.

19. Save Mart employees receive different benefits from the company depending on whether they are union members or non-union employees. Most of the union employees receive benefits through the UFCW & Employers Trust pursuant to collective bargaining agreements. Non-union employees receive benefits pursuant to the terms of benefit plans adopted by Save Mart, governed by the terms of the benefit plans Save Mart has chosen to establish.

20. The Save Mart Select Retiree Health Benefit Plan, referred to herein as the Plan, is one of the benefit plans adopted by Save Mart for its non-union employees. It provides health care benefits to eligible retirees and their dependents. At all relevant times, the Plan provided for

a substantial medical benefit for retirees and their spouses, whether in the form of an HRA plan or payment of insurance premiums.

21.     From the Plan's inception until the end of 2015, the Plan provided group medical benefits to retirees and their dependents and contributed toward the premiums for that coverage. Starting in 2016, Save Mart modified the Plan to provide funding to a Health Reimbursement Account in lieu of premium contributions, referred to herein as the HRA benefit.  The HRA benefit was a monthly $500 contribution to a health reimbursement account for each eligible retiree and an additional $500 for their spouse (or $300, respectively, after age 65).  The retiree and spouse could use the money accrued in their HRA account to pay for qualified medical expenses, including paying premiums for individual health insurance coverage that retirees purchased for themselves and their spouses.  Under the terms of the Plan, the monthly contributions for each retiree and spouse accumulated until they were used for qualified medical expenses.  Members of Save Mart's HR Department communicated to employees that this benefit "could accumulate up until the retiree's death, [] could not be taken away, and that there was no deadline by which the amounts in the employee's HRA needed to be used prior to the death of the retiree."  Decl. of Valerie Vallo ("Vallo Decl."), submitted herewith, ¶ 16.

22.     At all times pertinent to this case, Save Mart UFCW-member employees received retiree medical benefits based on similar eligibility criteria to the Plan.  UFCW retirees continue to receive those benefits to this day, and unlike the benefits provided by the Plan, those retiree medical benefits cannot be taken away at Save Mart's discretion.

23.     The terms of the Plan and the Plan's Summary Plan Description stated that Save Mart "has the right to modify or terminate the Plan at any time for any reason."  However, Save Mart consistently and repeatedly misrepresented the meaning of this term to its employees. Specifically, it consistently and repeatedly told employees that—like the union benefits—retirees and their spouses would keep their retirement benefits provided by the Plan until the death of the retiree.  Save Mart made this misrepresentation both orally and in writing.

24.     Save Mart made repeated oral misrepresentations about the terms of the Plan to Plaintiffs, to existing employees, to potential recruits, and to the employees of stores that Save

Mart acquired over the years, in order to convince them not to join the union. Any time a new store opened or the union started to organize at an existing store, Save Mart sent a senior executive and an HR employee or employees to that store to meet with the employees. In these meetings, the HR representative(s) and company executive were trained to communicate that employees should not pay dues to join the union, since the non-union benefits—including retirement benefits—would always be as good as or better than the benefits enjoyed by union employees.

25.     This understanding of the Plan emanated from the very top of the company. Wendy Kennedy served as Save Mart's Vice President of HR in the early 2000s. Kennedy Decl. ¶ 3. In that role, Ms. Kennedy "oversaw the entire Human Resources Department, including payroll, benefits, recruiting, hiring, employee relations, and training." *Id*. ¶ 5. "All Human Resources employees ultimately reported to [her]," and she in turn "reported directly to Mike Silveira, the Senior Vice President of Human Resources." *Id*. With respect to retirement benefits, Ms. Kennedy's "job duties included participating in meetings with Human Resources personnel including the Benefits Manager as well as Store Managers, Division Supervisors, and other employees about these benefits." *Id*. ¶ 8. Ms. Kennedy confirms that "Save Mart leadership reassured employees coming from union stores that non-union benefits would be as good as or better than the union's," *id*. ¶ 12, and that she "always understood that Save Mart would provide eligible non-union retirees with health care benefits . . . for the duration of their lives," *id*. ¶ 8.

26.     In her role as Vice President of HR, Ms. Kennedy "conveyed this understanding to the rest of the Human Resources personnel because [she] believed it to be true." Kennedy Decl. ¶ 10. Ms. Kennedy therefore "directed the personnel on [her] Human Resources Department team to disseminate this message and they did so." *Id*. ¶ 14. Those personnel would in turn communicate that understanding to other Save Mart employees. For example, Kit Tharp explains that in her role as a member of Save Mart's HR Department, one of her "primary job duties" was "pitching how generous the non-union benefits packages were and specifically that they were as good or better than the union benefits." Decl. of Kathleen Tharp ("Tharp Decl."), submitted

1   herewith, ¶¶ 4-5.  Ms. Tharp received the instruction to deliver this message from Save Mart

2   executives, including Director of HR Jerry Sauer, Director of HR Steve Goodman, and Vice

3   President of HR Mike Silveira.  *Id.*  Ms. Tharp also received this instruction in "training that [she]

4   received when [she] joined Save Mart and over the course of [her] employment there," and on the

5   basis of this training she "always understood that Save Mart would provide eligible non-union

6   retirees with health care benefits for the duration of their lives." *Id.* ¶ 9.  Indeed, "[i]n nearly 30

7   years of working in the Human Resources Department at Save Mart, no one ever told [Ms. Tharp]

8   that the company could decide to eliminate [a] retiree's health benefits or mentioned any sort of

9   end date." *Id.* ¶ 15.  Ms. Tharp therefore confidently delivered the message to Save Mart

10  employees that the Plan's medical benefits were guaranteed for life at orientations for new store

11  openings as well as in meetings with new hires or transferring employees.  *Id.* ¶ 6.

12         27.     At new store openings—which Ms. Tharp participated in between six and ten

13  times per year—she was joined in delivering this message by a Vice President of HR, a Division

14  Supervisor, a Store Manager, a Training Manager, and/or a HR Benefits Department Manager.

15  Tharp Decl. ¶ 6.  When a new store opened, it was not part of a union and would unionize only if

16  the employees later voted to unionize.  New stores were staffed by both new employees and

17  employees transferring from an existing Save Mart location.  When existing employees who were

18  union members at their prior location expressed concern about losing their union benefits, they

19  were repeatedly assured "not to worry" because "their benefits would be as good or better than

20  the union's." *Id.* ¶ 7.  In reassuring these existing employees, Ms. Tharp recalls believing that

21  "Save Mart intended to take care of eligible non-union retirees for life because . . . the union

22  benefits [were] for life and the non-union benefits were promised to be as good or better." *Id.*

23  Similarly, Ms. Kennedy recalls multiple employee rallies at which owner Bob Piccinini told

24  employees that they were "a family."  Kennedy Decl. ¶ 7.  It was her "true understanding" that

25  "non-union retiree health benefits would always be as good or better than the union's," *id.* ¶ 15,

26  and that "lifetime benefits" were a "key pillar" of the promise that Bob Piccinini would take care

27  of the Save Mart family, *id.* ¶ 7.

28         28.     When Save Mart received reports that a store may be unionizing, it deployed HR

professionals to "tout the generousness of the benefits package and reiterate that the non-union benefits were always as good or better than the union benefits." Tharp Decl. ¶ 8. For example, Valerie Vallo recalls that an "important part of her role" as Manager of Employee Relations "was visiting stores to discuss the advantages to employees of stores remaining non-unionized, by talking about how generous the employee benefits were for non-union employees." Vallo Decl. ¶ 5. Internally, these meetings were referred to as "the roadshow" or "kumbaya" meetings because "the purpose was to foster harmony amongst the employees by reassuring them about their benefits and quelling any desires to give up those benefits" by unionizing. *Id.* As with Ms. Tharp, Ms. Vallo had been trained by Save Mart to understand and communicate "that Save Mart would provide eligible non-union retirees with health care benefits for the duration of their lives." *Id.* ¶ 6. In addition to receiving this message at "training that [she] received when [she] joined Save Mart and over the course of [her] employment there," *id.*, Ms. Vallo recalls being told by Save Mart's Vice President of HR, John Bacon, to deliver this message to employees, *id.* ¶ 10. The message worked: many Save Mart stores remained non-union "because the employees wanted to retain the benefits promised to non-unionized staff." *Id.* ¶ 10. Ms. Kennedy likewise recalls that Save Mart's anti-union messaging "was very effective and convincing to employees, and many Save Mart stores remained non-union because employees understood that their benefits would always be as good or better than the union's." Kennedy Decl. ¶ 13.

29.    Save Mart also misrepresented the terms of the Plan to employees in writing. In various descriptions of the Plan that Save Mart disseminated to employees over the years, it told employees that they would be covered under the Plan until they died.

30.    For example, Save Mart sent a pamphlet entitled "Save Mart Select Retiree Benefits" to each employee on an annual basis. Exhibit B; Vallo Decl. ¶ 15; Tharp Decl. ¶ 12. That pamphlet specifically stated that retiree medical coverage ends "[u]pon the death of the retiree," as shown in the screenshot below:

**WHEN COVERAGE ENDS**

- Upon non-receipt of your monthly premium contribution payment by the payment due date.
- Upon the death of the retiree. ✓
- Spousal coverage ends upon divorce from or death of the retiree. Domestic partner coverage ends upon termination of the domestic partnership or death of the retiree. Spouses only may be eligible to extend medical plan coverage upon death or divorce under the Consolidated Omnibus Budget Reconciliation Act (COBRA).



31.     Save Mart's HR professionals relied on this document to explain retirement benefits to Save Mart employees.  Tharp Decl. ¶ 12; Vallo Decl. ¶ 15.  Ms. Tharp and Ms. Vallo "understood this to mean that benefits would last until the retiree died." *Id*.  Accordingly, when employees asked HR about the HRA plan, they were told "that this provision meant the benefit would last for the duration of the retiree's life." *Id*.

32.     Save Mart made similar written misrepresentations of the Plan in a document entitled "Save Mart Supermarkets 2010 Retiree Health Plan Highlights."  Exhibit C.  This document, also, told employees that the medical benefit would last until the death of the retiree, as shown in the screenshot below:

**When Coverage Ends**

- Upon the death of the retiree
- Spousal coverage ends upon divorce from or death of the retiree. Spouses may be eligible to extend medical plan coverage upon death or divorce under the Consolidated Omnibus Budget Reconciliation Act (COBRA).

33.     Upon information and belief, discovery will show many more written misrepresentations of the Plan informing employees that the retiree medical benefits they worked so hard to secure would be theirs for the duration of their lives.  None of these written materials informed employees that the governing Plan documents stated that Save Mart retained the discretion to terminate the Plan and any of its component benefits at any time, including retroactively.  Indeed, Ms. Kennedy confirms that in her years as Vice President of HR, she "oversaw the dissemination" of "booklets, pamphlets, letters, and other documents describing non-union retiree health benefits to employees," and does "not recall ever seeing mention in any of these documents that Save Mart reserved the right to terminate these benefits."  Kennedy Decl.

¶ 16.

34.     Plaintiffs and their beneficiaries, and hundreds or thousands of similarly situated people, made employment decisions and planned the financial details of their retirements, including vitally important decisions like how long they would work before retirement, based on Save Mart's misrepresentations about the duration of the retiree medical benefits, which they reasonably believed would last for the rest of their lives based on Save Mart's direct misrepresentations that they would.

35.     At the time of the 2016 Plan amendment implementing the HRA benefit program for non-union employees, Save Mart told retirement-eligible employees that if they retired before December 31, 2017, they would be able to retain the HRA benefit for their spouses, but that the spousal benefit would not be available to employees who retired after this date.  The purpose of this feature of the amendment was to persuade eligible employees to retire because Save Mart had concluded that their retirements were in the best economic interests of the company, and in so doing Save Mart acted against the best interests of their employees and potential Plan participants.  The HR professionals charged with communicating this change to Save Mart employees and with fielding any questions about the amendment understood that the purpose of the change was to drive up retirement numbers.  Vallo Decl. ¶ 12.  These employees were also trained to communicate that the new "HRA benefit would belong to an employee until they died." *Id.* ¶ 14.

36.     In connection with this announcement, Plaintiffs and other similarly situated employees spoke with HR employees who were specifically tasked by Save Mart to communicate information about retiree medical benefits.  HR told them that by retiring by December 31, 2017, they would retain the HRA benefit for them and their spouses for life.

37.     Plaintiffs and numerous other similarly situated employees retired earlier than they were planning to, on the basis of Save Mart's misrepresentation that they would retain the HRA benefit for life for them and their spouses if they retired by December 31, 2017.

38.     Save Mart's representations that the HRA benefit would continue for life were false and misleading.  The terms of the Plan allowed Save Mart to terminate the program at any

1   time, including for employees who retired before December 31, 2017.

2        39.   In March 2022 a private equity firm called Kingswood Capital Management LP

3   acquired Save Mart from the family that had owned it since its founding 70 years prior.  The new

4   owners *immediately* took action to eliminate the non-union benefits that Save Mart had so long

5   promised would be as good or better than the union's and would last for life.  On April 2022,

6   Save Mart announced that it was eliminating the HRA benefit entirely as of June 2022, which

7   eliminated all retiree medical benefits for non-union retirees.  Plan participants were told that they

8   had until June 2022 to incur covered medical expenses that would be paid for by the funds

9   accumulated in their HRA accounts.  After June 2022, no further medical expenses would be

10  covered, and all funds accumulated in the HRA accounts would revert to Save Mart.  The

11  decision to eliminate the HRA benefit and reclaim the accrued funds from employee accounts has

12  saved Save Mart's new owners tens of millions of dollars to date and will amount to potentially

13  hundreds of millions of dollars over the lifetimes of the eligible retirees in the Class.

14       40.   This abrupt change in policy shocked not only Plaintiffs, but also the HR

15  professionals who had been communicating to employees for years that the Plan's medical

16  benefits were guaranteed for life and had themselves relied upon this lifetime guarantee in

17  making personal employment decisions.  For example, Ms. Tharp had "counted on" receiving the

18  benefits for both herself and her spouse until she died, and was therefore "shocked when [she]

19  received notice from the company that it was terminating these benefits." Tharp Decl. ¶ 17.  As

20  was the case for Plaintiffs and many other Save Mart employees, Ms. Tharp "had chosen to

21  continue [her] employment at Save Mart for so many years specifically because of the promise of

22  retiree medical benefits," and "would not have retired in 2015 had [she] believed Save Mart could

23  terminate the HRA benefit." *Id*. ¶¶ 17-18.  Similarly, Ms. Vallo had retired early in 2017 in direct

24  response to Save Mart's promise that early retirees could preserve the Plan's medical benefits for

25  themselves and their spouses for life, as her husband had just undergone two major surgeries and

26  it was a top priority for her to preserve his medical benefits.  Vallo Decl. ¶ 19.  She, too, "was

27  shocked when [she] received notice in April 2022 from the company that it was terminating these

28  benefits," as this was "not something that [she] ever thought could happen" and she "would not

have retired in 2017 had [she] believed Save Mart could terminate the HRA benefit." *Id*.

41.    As a direct and proximate result of Save Mart's misrepresentations regarding the duration of the HRA benefit, Plaintiffs and a similarly situated class of retirees and their beneficiaries were harmed in the form of lost retiree health benefits.

42.    Save Mart's actions in ceasing HRA contributions and dismantling the HRA benefit program in 2022 were not in compliance with the terms of the Plan.

43.    The terms of the Plan state that: "The Company reserves the right to terminate the Plan or any Benefit Program at any time as designated by a written instrument adopted by the Board of Directors or its designee and duly executed on behalf of the Company."

44.    The HRA benefit was a "Benefit Program" within the meaning of the Plan.

45.    Subsequent to the filing of their initial and first amended complaints Plaintiffs have learned through discovery that there is no "written instrument adopted by the Board of Directors or its designee and duly executed on behalf of the Company" terminating the HRA benefit program.

46.    Save Mart was required by law to comply with the procedures and requirements set forth in the Plan document when terminating the HRA benefit program. Because Save Mart did not do that with respect to the HRA benefit program, the program should still be operational: participants should have received HRA contributions continuously from July 2022 to the present, participants should have been able to continue to utilize accrued amounts in their HRA on qualified medical expenses, and employees who retired between April 2022 and the present, and who satisfied the eligibility requirements, should have been permitted to become participants in the Plan.

47.    Out of an abundance of caution, coincident with the filing of Plaintiffs' motion for leave to amend the complaint, Plaintiffs initiated the Plan's administrative claim process and submitted claims for benefits under the terms of the Plan to Save Mart in its capacity as Plan Administrator, through Save Mart's counsel in this litigation.  As of this filing Save Mart has not responded to Plaintiffs' claims.  Because Save Mart has clearly stated its position that it was entitled to terminate the program and did lawfully terminate the program, and in fact has already

dismantled the infrastructure necessary to administer the program and has not made any contributions or paid any claims out of the program since 2022, Plaintiffs believe that exhaustion of their administrative remedies with respect to this claim is futile.

48.     As a direct and proximate result of Save Mart's failure to comply with the Plan's procedures for terminating a benefit program, Plaintiffs and a proposed class of similarly situated retirees and their beneficiaries have been denied monthly HRA contributions that they were entitled to receive, along with reimbursement of qualified medical expenses from their HRA accounts, from June 2022 continuing through to the present and into the future.

## RULE 23 ALLEGATIONS

49.     Plaintiffs bring this action as a proposed class action on behalf of themselves and a Class of those similarly situated.

50.     The proposed Class is all people who were participants in the Plan as of June 30, 2022, and all people who retired and met the eligibility criteria to become participants in the Plan at any time between April 22, 2022 and the resolution of this action.

51.     The proposed Class is numerous, consisting of hundreds of people, such that joinder is impractical.

52.     There are questions of law and fact common to the Class, including but not limited to:

a.     Whether Save Mart complied with the Plan terms governing termination of benefit programs when it purported to eliminate the HRA benefit program in 2022?

b.     Whether Plaintiffs and the Class are entitled to relief under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) based on Save Mart's failure to properly terminate the HRA benefit program?

c.     Whether Plaintiffs and the Class are entitled to equitable relief, in the form of equitable surcharge, injunction, or other appropriate equitable relief under ERISA § 502(a)(3) because of Save Mart's failure to properly terminate the HRA benefit program?

d.     Whether Save Mart misrepresented the terms of the retiree medical benefit to Class members?

e.      Whether such misrepresentations constituted breaches of fiduciary duty under ERISA § 401(a)(1)(A)-(B)?

f.      Whether Plaintiff and the Class are entitled to equitable surcharge or other monetary relief to make them whole for Save Mart's breaches of fiduciary duty?

g.      Whether Plaintiffs and the Class are entitled to equitable relief to reform the terms of the Plan to make those terms consistent with the representations Save Mart made about the Plan benefits?

53.     These common questions of law and fact predominate over any relevant individual issues.

54.     Plaintiffs are members of the Class, and have claims typical of the Class.

55.     Plaintiffs are adequate class representatives, and have secured counsel experienced in the prosecution of claims under ERISA and class actions.

## ALLEGATIONS OF NAMED PLAINTIFFS

### Plaintiff Katherine Baker

56.     Plaintiff Baker began her career in 1977, at the age of eighteen, as a Bagger at a Fry's store in Fremont, California.  She worked in various positions until she was promoted to Store Manager in 1988.  At all times at Fry's, her position was union.

57.     Save Mart purchased Fry's in 1989, and Ms. Baker became a Save Mart employee.  Her years of service and her union status were preserved with the acquisition.  However, in approximately 1991 Ms. Baker's boss, Dennis Nutson, told her that if she wanted to remain a Store Manager with Save Mart, she would have to give up her union status.  Because of the medical needs of her family, Ms. Baker was especially concerned about preserving her medical benefits.  Mr. Nutson assured her that as a non-union manager, her benefits would always be as good as or better than the union's benefits.  On the basis of this representation, Ms. Baker decided to remain in management and give up her union status.

58.     Ms. Baker worked in Fremont, California until approximately 1993, when she moved to manage a store in San José, California.  In approximately 1994, she was promoted to General Merchandise Supervisor for the Bay Area.  In approximately 2001, she was promoted to

Grocery Supervisor for the Bay Area.  In approximately 2006, Ms. Baker was promoted to Senior Director of Operations, based out of Dublin, California but with responsibility for the greater Bay Area.  She remained in this position until her retirement in October, 2017.

59.    Over the years, Ms. Baker observed Save Mart's efforts to defeat the union from representing additional stores.  One common theme that she heard repeatedly from Save Mart representatives was that there was no need to join the union, because non-union employees' benefits would always be as good as or better than the union's benefits.

60.    Ms. Baker received a version of the "Save Mart Select Retiree Benefits" pamphlet on one or more occasions that contained the language: "WHEN COVERAGE ENDS:…Upon the Death of the Retiree."  Exhibit B.  Ms. Baker understood this to mean that provided she met the eligibility requirements for retirement, she would receive retirement health benefits for the duration of her life.

61.    Ms. Baker participated in meetings with the non-union employees whom she supervised in which it was clear that the retirement benefits really mattered to these employees, particularly the store managers, and that the understanding on the part of the employees was that as long as one met the eligibility requirements, they would retain the retiree medical benefits for life.  As their supervisor, Ms. Baker reinforced this understanding because she also understood that the benefits were intended to be for life and would always be as good or better than the union's.

62.    Throughout Ms. Baker's tenure at Save Mart, she worked long hours and six-day weeks, as well as numerous holidays.  This was the expectation communicated by Save Mart executives, management, and owner Bob Piccinini.  As a salaried worker, Ms. Baker was not compensated by way of added hourly earnings for the heavy workload, but the message from Save Mart was that workers would be rewarded for their years of dedicated service, hard work, and sacrifice with generous retirement benefits, including retiree health care benefits, for the rest of their lives.

63.    Ms. Baker was never told by anyone at Save Mart, nor did she ever see or read anything in writing stating or suggesting that the non-union retiree benefits could be terminated.

1   At all trainings, meetings, and presentations in which she participated or attended, the consistent

2   message was that non-union retiree benefits were for life and would be as good or better than the

3   union's.

4          64.     In approximately 2017, Ms. Baker received a letter from Save Mart advising her of

5   her eligibility for retirement, and notifying her that if she retired by December 31, 2017, both she

6   and her spouse would receive the HRA benefit, but if she did not, her spouse would lose his

7   benefit.  She was fifty-seven years old with forty years of service.  Ms. Baker believed the terms

8   of the letter were cut-and-dry: that if she retired by the deadline, she and her spouse would both

9   receive the HRA benefit until she died.

10         65.     Ms. Baker attended a presentation by HR about this letter and the HRA changes

11  for all the non-union employees from the twenty-eight stores that Ms. Baker supervised.  The

12  employees had many questions about the HRA changes.  The message from the HR

13  representative was that provided one met the eligibility requirements and retired by December 31,

14  2017, then the HRA benefit and spousal benefit would last for the life of the retiree.

15         66.     Ms. Baker had planned to work until the age of at least sixty-five, and those years

16  of income figured prominently in her family's retirement planning.  However, she did not want to

17  lose the HRA benefit for her spouse, knowing that medical care is especially important and costly

18  as one ages.

19         67.     In reliance on Save Mart's written and verbal representations that the HRA benefit

20  for her and her spouse would continue for the duration of her life, Ms. Baker decided to retire

21  early to keep the spousal benefit, and retired effective October 2017 at the age of fifty-seven.

22         68.     Save Mart's termination of the HRA benefit will cost Ms. Baker tens-of-thousands

23  of dollars over the duration of her life.

24      **Plaintiff Jose Luna**

25         69.     Plaintiff Luna began his lifelong career with Save Mart in 1984, at age twenty-one,

26  as a Cashier in Tracy, California.  The store that he joined was one of the few non-unionized Save

27  Mart stores, and the company was working hard to keep it that way.  When Mr. Luna joined, the

28  recruiters told him that as a non-union employee his benefits would be as good as or better than

1    the union's benefits.

2        70.    Within two years, Mr. Luna worked his way up to a Head Clerk position.  In 1989,

3    he was promoted to Assistant Store Manager and moved to a store in Turlock, California.  The

4    store was unionized but management positions were not included in the union.  At the time of his

5    promotion, Save Mart again reassured Mr. Luna that his benefits as a non-union employee would

6    be as good as or better than the union's benefits.

7        71.    Mr. Luna became a Store Manager in 1993 in Modesto, California.  From that time

8    until his retirement in December 2017, Mr. Luna worked as a Store Manager of unionized Save

9    Mart stores, though he was ineligible to join the union due to his management position.

10   Throughout that period of time, Mr. Luna heard many times that benefits for non-union

11   management positions would be as good as or better than the union's. For example, from

12   approximately 1993 until 2017, Mr. Luna attended regular, monthly meetings at John's Incredible

13   Pizza in Modesto.  The meetings were for store managers in the Northern District, and sometimes

14   assistant store managers attended as well. If there was a change in benefits, a representative of the

15   benefits department would attend to discuss it. HR representatives who attended these meetings

16   over the years included Beth Fugate, Wendy Kennedy, Valerie Vallo, Kit Tharp, and Vickie Del

17   Rey.  These HR representatives consistently said during these meetings that the store managers

18   and assistant store managers (both non-union positions) would always have retirement benefits as

19   good as or better than the union's.

20       72.    Mr. Luna attended a meeting for store managers and assistant store managers in

21   approximately 2010 or 2011 at a local brewery in Turlock called The Dustbowl. HR

22   representative Beth Fugate was present at the meeting to discuss retiree benefits.  Ms. Fugate

23   described the retiree health benefits as lasting for the life of the retiree.

24       73.    In 2015, through his combination of age (then fifty-three) and years of service

25   (thirty-two), Mr. Luna met the "Golden 85" rule making him eligible for retirement.  He received

26   a letter from Save Mart advising him of his eligibility, and notifying him that if he retired by

27   December 31, 2017, both he and his spouse would receive the HRA benefit, but if he did not, his

28   spouse would lose her benefit.

74.     Mr. Luna was extremely torn by this decision.  On the one hand, he had planned to work until the age of at least sixty-two, and those years of income figured prominently in his family's retirement planning.  Also, management had just offered him a new position in a store that was projected to bring large bonuses.  On the other hand, he did not want to lose the HRA benefit for his spouse, knowing that medical care is especially important and costly as one ages.  In 2017, he spoke with Valerie Vallo in Save Mart's HR department to ask questions about his retirement benefits to help him make this critical decision.  Ms. Vallo told him that as long as he retired by December 31, 2017, both he and his spouse would keep their HRA benefit for the duration of Mr. Luna's life.

75.     In reliance on Save Mart's written and verbal representations that the HRA benefit would be for the duration of his life, Mr. Luna decided to retire early to keep the spousal benefit, and retired effective December 31, 2017 at the age of fifty-six.

76.     Save Mart's termination of the HRA benefit will cost Mr. Luna tens-of-thousands of dollars over the duration of his life.

**Plaintiff Edgar Popke**

77.     Plaintiff Popke was raised on Save Mart food and in the Save Mart family.  His mother worked most of her career for Save Mart.  Mr. Popke joined Save Mart in 1978, at age eighteen, as a Produce Clerk in Modesto, California.  The position was union and Mr. Popke received union benefits.

78.     Mr. Popke was soon promoted to Produce Manager, and then recruited to become a Store Manager, which was a non-union position.  Mr. Popke deferred the promotion for several years because of the additional hours of work it would require and the young age of his children.  In 2003, he decided to accept a promotion, and at that time he spoke with his managers Steve Beaver and Bob Bauer about the impact that the promotion would have on his benefits package.  They assured Mr. Popke that his benefits would always be as good as or better than the union's.

79.     Mr. Popke was promoted several times in the following years.  He moved from Produce Supervisor for the Central Division, to Special assistant to Executive Vice President Junquiero, to Senior Director for the Bay Area District, to Senior Director of the Modesto Region,

1  and finally to Vice President of Operations in 2011.  He remained in that role until his retirement

2  in 2017.

3        80.     During his tenure as Senior Director for the Bay Area, one of Mr. Popke's primary

4  responsibilities was to oversee the integration of stores that Save Mart acquired through purchase

5  (such as former Albertson's stores) into the Save Mart model.  Save Mart worked hard to prevent

6  these stores from joining the union.  Mr. Popke was advised by Wendy Kennedy, then Vice

7  President of HR, to tell newly-acquired store employees that their benefits would always be as

8  good as or better than the union's.  He visited many Bay Area stores alongside representatives

9  from Save Mart's HR department to speak to the employees and their families about

10  compensation and benefits.  He consistently heard the refrain that non-union employees' benefits

11  would always be equal to or better than the union's.

12        81.     Mr. Popke received a version of the "Save Mart Select Retiree Benefits" pamphlet

13  on one or more occasions that contained the language: "WHEN COVERAGE ENDS:…Upon the

14  Death of the Retiree."  Exhibit B.  Mr. Popke understood this to mean that provided he met the

15  eligibility requirements for retirement, he would receive retirement health benefits for the

16  duration of his life.

17        82.     In approximately 2017, Mr. Popke received a letter from Save Mart advising him

18  of his eligibility for retirement, and notifying him that if he retired by December 31, 2017, both

19  he and his spouse would receive the HRA benefit, but if he did not, his spouse would lose her

20  benefit. At that time he was fifty-six years old with and thirty-eight years of service.

21        83.     Mr. Popke had planned to work until the age of at least sixty-two, and those years

22  of income figured prominently in his family's retirement planning.  He was well paid for his work

23  and enjoyed it.  However, he did not want to lose the HRA benefit for his spouse, knowing that

24  medical care is especially important and costly as one ages.

25        84.     In reliance on Save Mart's written and verbal representations that the HRA benefit

26  would be for the duration of his life, Mr. Popke decided to retire in time to keep the spousal

27  benefit, and retired effective January 3, 2017 at the age of fifty-six.

28        85.     Save Mart's termination of the HRA benefit will cost Mr. Popke tens-of-thousands

1    of dollars over the duration of his life.

2          **Plaintiff Denny G. Wraske, Jr.**

3          86.    Plaintiff Wraske joined Save Mart in 1971, at the age of seventeen, as a Grocery

4    Clerk in Modesto, California.  The position was union and Mr. Wraske received union benefits.

5    He worked in various union positions until he was promoted to Assistant Store Manager in

6    approximately 1985.

7          87.    Mr. Wraske was promoted several times in the following years.  He moved from

8    Assistant Store Manager to Store Manager, to Grocery Superior of Modesto and the Bay Area, to

9    Senior Director in Modesto and in Fresno, and finally to Senior Director of Operations for

10   Northern California in approximately 2010.  He remained in that role until his retirement in 2017.

11         88.    Over the years, Mr. Wraske observed Save Mart's efforts to defeat the union from

12   representing additional stores.  One common theme he heard repeatedly from Save Mart

13   representatives was that there was no need to join the union, because non-union employees'

14   benefits would always be as good as or better than the union's benefits.

15         89.    In approximately 2017, Mr. Wraske received a letter from Save Mart advising him

16   of his eligibility, and notifying him that if he retired by December 31, 2017, both he and his

17   spouse would receive the HRA benefit, but if he did not, his spouse would lose her benefit.  He

18   was sixty-three years old and had worked for Save Mart for forty-six years.

19         90.    At that time, Mr. Wraske and his wife's retirement plan was that Mr. Wraske

20   would work for another three years.  However, he did not want to lose the HRA benefit for his

21   spouse, knowing that medical care is especially important and costly as one ages, and because his

22   wife also wanted to retire, which would eliminate her medical benefits.

23         91.    Mr. Wraske received a version of the "Save Mart Select Retiree Benefits"

24   pamphlet on at least one occasion that contained the language: "When Coverage Ends:…Upon

25   the Death of the Retiree."  Exhibit B.  Mr. Wraske understood this to mean that provided he met

26   the eligibility requirements for retirement, he would receive retirement health benefits for the

27   duration of his life.

28         92.    In reliance on Save Mart's written and verbal representations that the HRA benefit

                                            -23-

1    would be for the duration of his life, Mr. Wraske decided to retire in time to keep the spousal

2    benefit, and retired effective December 28, 2017 at the age of sixty-four.

3         93.    Save Mart's termination of the HRA benefit will cost Mr. Wraske tens-of-

4    thousands of dollars over the duration of his life.  It also meant that his wife has had to postpone

5    her retirement in order to maintain her medical benefits.

6                              **FIRST CLAIM FOR RELIEF**
                    **(Breach of Fiduciary Duty Under ERISA § 401(a)(1) (A) and (B)**
7                         **Against Defendant Save Mart)**

8         94.    Plaintiffs incorporate the preceding paragraphs as though set forth herein.

9         95.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires that a fiduciary discharge his

10   or her duties with respect to a plan solely in the interest of the participants and beneficiaries, (A)

11   for the exclusive purpose of providing benefits to participants and the beneficiaries of the Plan,

12   and (B) with the care, skill, prudence and diligence under the circumstances then prevailing that a

13   prudent person acting in a like capacity and familiar with such matters would use in the conduct

14   of an enterprise of a like character and with like aims.

15        96.    A fiduciary's duties of loyalty and prudence include a duty to disclose and inform.

16   These duties not only require that a fiduciary comply with the disclosure provisions in Title I of

17   ERISA, but also require: (a) a negative duty not to misinform; (2) an affirmative duty to inform

18   when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey

19   complete and accurate information material to the circumstances of participants and beneficiaries.

20        97.    Save Mart breached these duties as to Plaintiffs and the Class by misrepresenting

21   that the company would provide health care benefits to eligible retirees and their spouses that

22   were as good or better than those enjoyed by UFCW members, including by misrepresenting the

23   duration of retiree medical benefits as lasting until the death of the retiree.  These breaches

24   occurred and continued from the inception of the Plan up through the date that Save Mart

25   announced it was terminating the HRA benefit on April 22, 2022.  Plaintiffs and other employees

26   relied on Save Mart's misrepresentations to their detriment.

27        98.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a plan participant to bring a

28   civil action to obtain appropriate equitable relief to redress violations of ERISA, including Save

Mart's breaches of its fiduciary duties under ERISA § 401(a)(1), 29 U.S.C. § 1104(a)(1).

99.     Under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiffs and the Class are entitled to: have the Plan reformed to reflect Save Mart's repeated promise to provide benefits as good or better than the union's and to reflect Save Mart's repeated promise that retiree medical benefits, including the HRA benefit for retirees and their spouses specifically, would last until the death of the retiree; and/or have Save Mart pay an equitable surcharge or restitution to compensate Plaintiffs and the Class for the loss of retiree medical benefits and the HRA benefit specifically and the retirement decisions they made based on Defendant's misrepresentations.

**SECOND CLAIM FOR RELIEF**
**(Claim for Benefits Due Under the Terms of the Plan Pursuant to ERISA § 502(a)(1)(B)**
**Against Defendant Save Mart and Defendant Plan)**

100.    Plaintiffs incorporate the preceding paragraphs as though set forth herein.

101.    Under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), a participant or beneficiary may bring a civil action to recover benefits due to them under the terms of the Plan, to enforce their rights under the terms of the Plan, or to clarify their right to future benefits under the terms of the Plan.

102.    Defendant Save Mart violated the terms of the Plan by failing to have the Board of Directors or its designee adopt and duly execute a written instrument terminating the HRA benefit program. Defendant Save Mart and Defendant Plan's decision to cease making HRA contributions for current participants, cease reimbursing claims for qualified medical expenses, and discontinue any possibility of future participation in the Plan for active employees as of June 2022 was unlawful and a violation of the Plan terms.

103.    Defendant Plan is a proper defendant for a claim under ERISA § 502(a)(1)(B) under ERISA § 502(d)(1)-(2).

104.    Defendant Save Mart, as the Plan's formal Plan Administrator and as the entity liable to fund benefit contributions under the Plan, is a proper defendant for a claim under ERISA § 502(a)(1)(B) pursuant to *Cyr v. Reliance Standard Life Ins. Co.*, 642 F.3d 1202, 1205-06 (9th Cir. 2011).

105.    Coincident with the filing of their motion for leave to amend the complaint,

1    Plaintiffs submitted claims for benefits to Save Mart for past due and future HRA benefit

2    contributions in an attempt to exhaust their administrative remedies.  However, Plaintiffs believe

3    that exhaustion of their administrative remedies would be futile in this case because Save Mart

4    has clearly established its position in this litigation that its termination of the HRA benefit

5    program was lawful and has already dismantled the infrastructure necessary to make HRA benefit

6    contributions and process HRA benefit claims.

7           106.    As a direct and proximate result of Save Mart's failure to properly terminate the

8    HRA benefit program, Plaintiffs and the proposed Class have been deprived of monthly HRA

9    benefit contributions that they were and are entitled to receive starting in April 2022 and

10   continuing through to the present.

11          107.    Under ERISA § 502(a)(1)(B), Plaintiffs and the Class are entitled to a judgment

12   from the Court requiring Save Mart to: (a) for Plan participants: make past-due HRA benefit

13   contributions from July 1, 2022 through the resolution of this action, with reasonable prejudgment

14   interest on each and every monthly payment, and to reimburse qualified medical expenses

15   incurred since July 1, 2022; and (b) for employees who retired and obtained the eligibility

16   requirements necessary to participate in the Plan anytime from April 22, 2022 to the resolution of

17   this action, an opportunity to become participants in the Plan, and for Save Mart to make past-due

18   HRA benefit contributions from the date eligibility was obtained through the resolution of this

19   action, with reasonable prejudgment interest on each and every monthly payment.

20                          **THIRD CLAIM FOR RELIEF**
21   **(Claim for Equitable Relief to Enforce the Terms of the Plan Under ERISA § 502(a)(3)
     Against Defendant Save Mart)**

22          108.    Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

23          109.    Under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), a participant or beneficiary

24   may bring a civil action to enjoin any act or practice which violates the terms of the Plan or to

25   obtain other appropriate equitable relief to redress violations of the terms of the Plan.

26          110.    Save Mart's decision to cease operating the HRA benefit program in 2022 was a

27   violation of the Plan terms governing termination of benefit programs and the Plan terms

28   requiring Save Mart to make HRA contributions and to process and pay valid HRA benefit

1    claims.

2        111.    As a direct and proximate result of Save Mart's failure to properly terminate the

3    HRA benefit program, Plaintiffs and the Class have been deprived of monthly HRA benefit

4    contributions that they were and are entitled to receive starting in April 2022 and continuing

5    through to the present.

6        112.    As a direct and proximate result of Save Mart's failure to properly terminate the

7    HRA benefit program, Class members who obtained the necessary requirements for eligibility

8    under the Plan after April 22, 2022 have been deprived of the opportunity to become participants

9    in the Plan, and of the monthly HRA contributions and reimbursement of qualified medical

10   expenses that they were entitled to receive starting on the date on which they retired and obtained

11   eligibility and continuing through to the present.

12       113.    Under ERISA section 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiffs and the Class

13   are entitled to injunctive relief requiring Save Mart to continue to operate the Plan, to permit any

14   Class members who retired and obtained eligibility requirements after April 22, 2022 to become

15   participants in the Plan, and to make monthly HRA benefit contributions and to process HRA

16   benefit claims retroactive to July 1, 2022 (for people who were participants as of April 22, 2022)

17   or retroactive to the date retirement and eligibility was obtained (for people who became eligible

18   to be participants after April 22, 2022), for the remainder of their lives, along with reasonable

19   prejudgment interest on past-due HRA benefit contributions.

20                              **PRAYER FOR RELIEF**

21       WHEREFORE, Plaintiffs pray that the Court grant the following relief:

22       A.    Declare that Save Mart has breached its fiduciary duties to Plaintiffs and

23   the Class and/or knowingly participated in breaches of fiduciary duty;

24       B.    Order that Save Mart pay benefits due under the terms of the Plan and

25   provide appropriate equitable relief to Plaintiffs and the Class, including but not limited to

26   surcharge, reformation of the Plan, and/or an injunction requiring Save Mart to administer the

27   Plan with respect to Plaintiffs and the Class in a manner consistent with the terms of the Plan in

28   existence prior to the discontinuation of the HRA benefit in 2022;

1           C.      Award Plaintiffs and the Class attorneys' fees and costs of suit incurred

2    herein pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g); and

3           D.      Provide such other relief as the Court deems equitable and just.

4    Dated:  February 9, 2024           Respectfully submitted,

5                                             BOLT KEENLEY KIM LLP

6

7                                  By: */s/ James P. Keenley*

8                                     James P. Keenley (CA Bar No. 253106)
                               Emily A. Bolt (CA Bar No. 253109)

9                                   BOLT KEENLEY KIM LLP
                               2855 Telegraph Ave., Suite 517

10                                  Berkeley, CA 94705
                               Phone: (510) 225-0696

11                                  Fax: (510) 225-1095
                               jkeenley@bkkllp.com

12                                  ebolt@bkkllp.com

13                                  Anne B. Shaver (CA Bar No. 255928)
                               Michelle A. Lamy (CA Bar No. 308174)

14                                  Benjamin A. Trouvais (CA Bar No. 353034)
                               Lieff Cabraser Heimann & Bernstein, LLP

15                                  275 Battery St., 29th Floor
                               San Francisco, CA 94111-3339

16                                  Phone:  (415) 956-1000
                               Fax:  (415) 956-1008

17                                  ashaver@lchb.com
                               mlamy@lchb.com

18                                  btrouvais@lchb.com

19                                  Matthew J. Matern (CA Bar No. 159798)
                               Mikael H. Stahle (CA Bar No. 182599)

20                                  MATERN LAW GROUP, PC
                               1230 Rosecrans Ave., Suite 200

21                                  Manhattan Beach, CA 90266
                               Phone: (310) 531-1900

22                                  Fax: (310) 531-1901
                               mmatern@maternlawgroup.com

23                                  mstahle@maternlawgroup.com

24                                  *Attorneys for Plaintiffs and the Proposed Class*

25

26

27

28

                           SECOND AMENDED COMPLAINT
                                         CASE NO. 3:22-CV-4645-AMO